IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

BRENDA SALINAS NAVARRETE,

        Plaintiff,

        v.

PEACEHEALTH, a corporation,

        Defendant.

**OPINION & ORDER**

Civ. No. 6:22-cv-00181-AA

AIKEN, District Judge.

Plaintiff Brenda Salinas Navarrete brings a religious discrimination claim against her former employer Defendant PeaceHealth under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*., and ORS 659A.030. *See* Compl., ECF No. 1. Before the Court is Defendant's Motion for Summary Judgment, ECF No. 58. For the reasons explained below, Defendant's Motion, ECF No. 58, is GRANTED.

## BACKGROUND

"PeaceHealth is a not-for-profit healthcare system headquartered in Vancouver, Washington, with medical centers, critical access hospitals, and medical clinics located in Washington, Oregon, and Alaska." Le Decl. ¶ 3, ECF No. 61. "As of August 2021, PeaceHealth employed approximately 16,250 caregivers across Alaska, Oregon, and Washington," including "approximately 5,720 caregivers in Oregon." *Id.*

Page 1 – OPINION AND ORDER

I.      *The COVID-19 Pandemic*

From May 5, 2020, until May 11, 2023, COVID-19, an infection caused by the virus SARS-CoV-2, "one of the most contagious currently known human pathogens" caused a global pandemic.  Koekkoek Decl. ¶ 4, ECF No. 59.[1]  During the summer of 2021, the COVID-19 Delta variant, "the deadliest and most transmissible variant of [the SARS-CoV-2 virus] to date," *id.* ¶ 10, caused an approximate 300% spike in national COVID-19 cases, *id.* ¶ 43, Ex. 16, ECF No. 59-16, and an Oregon spike that exceeded Oregon Health Science University's ("OHSU's") worst case scenario prediction models, *id.* ¶ 21, Ex. 4, 5, 6, ECF Nos. 59-4, 59-5, 59-6.

Dr. Koekkoek attests that "[i]n [his] 35-plus years in healthcare, [he] ha[s] never experienced anything like the Delta variant."  *Id.* ¶ 11.  He attests that "PeaceHealth's facilities were overflowing with patients[,]" that their ICUs were so full that they "had to stop elective surgeries and convert [former ICU] recovery areas into COVID ICU areas[,]" *id.*, "which created treatment delays for patients with other serious conditions[,]" *id.* ¶ 12.  Because the local morgues could not handle more dead bodies, PeaceHealth had to turn some of their areas into "cooling bays" to hold the bodies of individuals who had died from COVID-19[,] *id.* ¶ 11, that "the Oregon Governor activated the Oregon National Guard to assist PeaceHealth with everything from janitorial work to administering COVID-19 tests[,]" *id.* ¶ 24, and

---

[1] Dr. Douglas Koekkoek, MD, was PeaceHealth's Chief Physician and Clinical Executive during the pandemic.  Koekkoek Decl. ¶ 2, ECF No. 59.

that "[t]he impact was devastating and profound—despite all precautionary efforts in effect[,]" *id.* ¶ 11.

II.    *Oregon Health Authority Response*

On August 5, 2021, in response to the Delta surge, the Oregon Health Authority ("OHA") issued a rule requiring all Oregon healthcare providers and staff to either be fully vaccinated against COVID-19 by September 30, 2021, or to "undergo COVID-19 testing at least weekly." *Former* OAR 333-019-1010(3)-(5) (eff. Aug. 5, 2021, to Aug. 24, 2021) ("OHA Rule" or the "Rule").

But on August 25, 2021, less than three weeks later, OHA amended the Rule to remove the testing option and to require vaccination of all health care providers and staff by October 18, 2021, absent medical or religious exception. *Former* OAR 333-019-1010(3)-(4), (eff. Aug. 25, 2021, to June 30, 2023). At that time, PeaceHealth and other health care facilities were already complying with requirements to mask and physical distance and to screen, triage, and isolate individuals with symptoms or known infection. *See former* OAR 333-019-1011 (eff. Aug. 20, 2021, to Mar 28, 2023); *former* OAR 437-001-0744 (eff. Nov. 6, 2020, to Apr. 2, 2023).

III.    *PeaceHealth's COVID-19 Vaccination Policy*

That summer, PeaceHealth convened an Ethical Discernment Team (the "Team") to determine whether PeaceHealth should require its employees to be vaccinated against COVID-19. Koekkoek Decl. ¶¶ 26, 27 (citing Ex. 10, the Team's five-step decision-making process, ECF No. 59-10). In late July 2021 and throughout the Pandemic, the Team reviewed OHSU's Oregon Delta forecasts, *id.* ¶ 21 (citing

Page 3 – OPINION AND ORDER

Ex. 4, 5, 6, ECF Nos. 59-4, 59-5, 59-6), CDC Morbidity & Mortality Weekly Reports ("MMWR") and other peer-reviewed scientific and medical data, *id.* ¶¶ 14, 37–47 (citing Ex. 13–21, ECF Nos. 59-13 through 59-21), recommendations from OHA, CDC, and professional health care organizations such as the American Nurses Association, American Hospital Association, and American Medical Association, *id.* ¶¶ 20, 30, 37, 41–47 (citing Ex. 3, 13–21), and actions taken by other major hospital systems such as the Veterans Administration, *id.* ¶ 30. Dr. Koekkoek attests that "[b]y late July 2021, it was clear that the threat and ultimate arrival of the Delta variant posed a foundational risk to PeaceHealth's ability to deliver healthcare services." *Id.* ¶ 25.

Dr. Koekkoek also attests that "[b]y August 2021, COVID-19 had become a pandemic of the unvaccinated." *Id.* ¶ 22. PeaceHealth census data showed that about 80% of its COVID-19 hospitalized patients, 94% of its COVID-19 ICU patients, and 93% of its COVID-19 patients on ventilators were unvaccinated. *Id.* "A significant portion of PeaceHealth's patients [were] medically vulnerable individuals, who either could not be vaccinated (due to age or medical conditions) or who, despite vaccination, [were] more susceptible to serious illness or death" from exposure and breakthrough contraction. *Id.* ¶¶ 7, 28–29, 38 (describing vulnerable patient population). As of August 3, 2021, 19.7% of Oregon PeaceHealth employees were unvaccinated or undeclared (failed to respond to vaccination status surveys). Le Decl. ¶ 14, ECF No. 61.

Dr. Koekkoek attests that, by August 2021, then current medical and scientific data from CDC, OHA, and other leading public health sources showed that COVID-

19 vaccines protected vaccinated individuals against severe illness and death and reduced viral transmission. Koekkoek Decl. ¶¶ 37–47 (citing Ex. 13–21).[2]    Dr.

---

[2] A review of vaccine efficacy studies "showed that through the end of June 2021, COVID-19 vaccines had averted an estimated 279,000 deaths and 1.25 million hospitalizations in the United States." Koekkoek Decl. ¶ 39, Ex. 13, ECF No. 59-13 (Stephen J.W. Evans & Nicholas P. Jewell, *Vaccine Effectiveness Studies in the Field*, 385(7) N. ENG. J. MED. 650 (Aug. 2, 2021)); A New England Journal of Medicine ("NEJM") study "showed that being fully vaccinated against COVID-19 reduced the risk of infection by 91% and still protected against severe illness and hospitalization if breakthrough infection occurred." Koekkoek Decl. ¶ 40, Ex. 14, ECF No. 59-14 (Mark G. Thompson, et al., *Prevention and Attenuation of Covid-19 with the BNT162b2 and mRNA-1273 Vaccines*, 385(4) N. ENG. J. MED. 320–329 (June 30, 2021)); A July 29, 2021 CDC Report (in the form of a slide deck) "indicated that unvaccinated individuals were 8 times more likely to contract COVID-19 than vaccinated individuals; 25 times more likely to be hospitalized if they contracted COVID-19; and 25 times more likely to die as a result of COVID-19." And though it reported "lower [vaccine efficacy] against [transmitting] infection," it also reported that "as compared to unvaccinated cases, vaccinated cases had lower viral loads, shorter duration of detectable viral RNA, lower risk of febrile symptoms, and shorter mean duration of symptoms. . . . and recommended to '[c]onsider vaccine mandates for [healthcare providers] to protect vulnerable populations[.]'" Koekkoek Decl. ¶ 42, Ex. 15, ECF No. 59-15 (CDC, *Improving communications around vaccine breakthrough and vaccine effectiveness*, (July 29, 2021)); In updated guidance, "the CDC emphasized that the COVID-19 vaccines . . . continue[d] to be highly effective at preventing hospitalization and death, and that fully vaccinated people with breakthrough infections appear[ed] to be infectious for a shorter period." Koekkoek Decl. ¶ 44, Ex. 17, ECF No. 59-17 (CDC, *See Benefits of Getting a COVID-19 Vaccine*, (Aug. 16, 2021), https://archive.is/lvjHl#selection-1809.0-1809.38); A September 17, 2021 CDC report showed that "[a]fter Delta became the most common variant, . . . data showed that fully vaccinated individuals had an approximately 500% (5 times) reduced risk of infection and—at minimum—a 1,000% (or 10 times) reduced risk of hospitalization and a 1,000% (or 10 times) reduced risk of death than unvaccinated individuals." Koekkoek Decl. ¶ 45, Ex. 18, ECF No. 59-18 (Heather M. Scobie, Ph.D., et al., *Monitoring Incidence of COVID-19 Cases, Hospitalizations, and Deaths, by Vaccination Status—13 U.S. Jurisdictions, April 4–July 17, 2021*, MMWR 70(37):1284–1290 (Sept. 17, 2021), https://www.cdc.gov/mmwr/volumes/70/wr/mm7037e1.htm); A September 2021 CDC study that "pooled clinical and observational trial data for the Pfizer BioNTech vaccine showed that [the vaccine] was approximately 95% effective at preventing hospitalization or death." Koekkoek Decl. ¶ 46, Ex. 19, ECF No. 59-19 (Kathleen Dooling, et al., *Use of Pfizer-BioNTech COVID-19 Vaccine in Persons Aged >16 Years:*

---

Koekkoek attests that though a July 29, 2021, CDC report revealed that, after Delta, the vaccine's efficacy against transmission *might* be reduced due to breakthrough infections, it also revealed that, compared with unvaccinated individuals, vaccinated individuals (with breakthrough infections) had shorter infectious periods. *Id.* ¶ 42 (emphasis added) (citing Ex. 15, July 29, 2021). He further attests that the same CDC report "recommended to '[c]onsider vaccine mandates for [healthcare providers] to protect vulnerable populations[.]'" *Id.* (quoting Ex. 15, at 23).

On July 27, 2021, the Team unanimously decided to implement a vaccination requirement that complied with the OHA Rule. *Id.* ¶ 29. The policy was announced on August 3, 2021, *id.* ¶ 34, but was updated on August 30, after OHA removed the testing option from its Rule, Le Decl. ¶ 17. Dr. Koekkoek attests that the Team "anticipated that very few of the approximately 20% of PeaceHealth's caregivers who remained unvaccinated would request exceptions" and, for that reason, expected to "operationalize accommodations of remote work, job duty modifications, regular testing, and N95 masking." Koekkoek Decl. ¶ 34.

On August 16, 2021, the Team decided to implement a medical and religious exception policy and "considered potential options . . . for those caregivers who could not work fully remotely." Koekkoek Decl. ¶¶ 53. The Team determined, based on its "review of the internal and external data and guidance [and] . . . the medical science[,]

---

*Recommendations of the Advisory Committee on Immunization Practice–United States, September 2021*, MMWR 70(38):1344–1348 (Sept. 24, 2021), https://www.cdc.gov/mmwr/volumes/70/wr/mm7038e2.htm).

. . . that, while multiple methods of protection against COVID-19 were important, vaccination was the single most important method." *Id.* ¶¶ 54, 59. The Team determined that, "unlike vaccination, other methods—such as PPE (including N95 masks), testing, social distancing, restrictions on visitation, and additional hand hygiene protocols—were already the 'baseline' requirements, do not provide continuous protection 24 hours per day, and are susceptible to human error[,]" and that, to be effective, PPE must be worn properly and must be worn continuously but is less likely to be worn, for example, in breakrooms where transmission could occur. *Id.* ¶ 55. As to testing, Dr. Koekkoek attests that by time a test is positive, an infected person is likely to be contagious for 48 hours before the test and that the cost of repeatedly testing a large volume of unvaccinated caregivers was "significant." *Id.* ¶ 56. The Team determined that, unlike the other preventive measures, "vaccination not only protects against acquiring and transmitting the virus, it also—unlike any other preventative measures—reduces the likelihood that an infected individual is contagious or will develop serious illness or death if they do contract the virus." *Id.* ¶ 58.

Dr. Koekkoek attests that "[a]lthough [the Team] had made the preliminary determination . . . to permit [unvaccinated caregivers] to continue working with N95 masks and weekly testing, we were surprised by the sheer volume of exception requests received" and realized that instead of a "handful" of unvaccinated caregivers, there would be "hundreds." *Id.* ¶ 59. For that reason, the Team "determined that allowing unvaccinated caregivers to work in person (even with other precautions)

Page 7 – OPINION AND ORDER

would have subjected other caregivers and patients—including those who were medically fragile or vulnerable—to a higher risk of contracting COVID-19." *Id.* ¶ 60. That "caregivers themselves were also at risk . . . threatened PeaceHealth's ability to continue providing essential, life-saving treatment for its patients." *Id.* ¶ 61. For that reason, the Team determined that "allowing unvaccinated caregivers to work in person (even with other precautions) would have subjected other caregivers and patients . . . to a higher risk of contracting COVID-19." *Id.* ¶ 60.

IV.    *Plaintiff's Claim*

In August 2021, Plaintiff was employed as an Environmental Services Attendant at PeaceHealth's Sacred Heart Medical Center. Le Decl. ¶ 34; Compl. ¶ 5; Riggs Decl. ¶ 10, Ex. 9, Navarrete Dep. 11:05–12:10, ECF No. 62-7. Plaintiff applied for and was granted a religious exception to PeaceHealth's vaccination requirement. Le Decl. ¶ 35. Plaintiff was placed on unpaid administrative leave, effective September 1, 2021. *Id.* ¶ 36.

## LEGAL STANDARD

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry

Page 8 – OPINION AND ORDER

its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see also Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'" (quoting *Celotex*, 477 U.S. at 325)). In reviewing a summary judgment motion, a court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.*

## DISCUSSION

Plaintiff brings a religious discrimination claim under Title VII and Oregon law against her former employer PeaceHealth for its failure to accommodate her religious beliefs.

I.    *Evidentiary Objections*

    A.    *Plaintiff's Objection to Kroll Declaration*

In her Response, Plaintiff raises five evidentiary objections to the testimony of PeaceHealth's epidemiologist Catherine Kroll and six evidentiary objections to the

testimony of PeaceHealth's Chief Physician and Clinical Executive, Dr. Douglas Koekkoek.[3] *See* Pl. Resp. at 20–25, ECF No. 69.

Plaintiff objects to Ms. Kroll's statements in paragraphs 25 through 34 of her declaration as to specific internal epidemiologic data from which Ms. Kroll determined that "PeaceHealth's patients were 7.1 times more likely to have been exposed to COVID-19 and 11.6 times more likely to get COVID-19 when they were cared for by an unvaccinated caregiver as compared to a vaccinated caregiver." Pl. Resp. at 20 (citing Kroll Decl. ¶ 29, ECF No. 60). Plaintiff also objects to Exhibit 3, which summarizes that data. *Id.* (citing Kroll Decl., Ex. 3, "Data on Patient Conversions After Exposure," ECF No. 60-3). Plaintiff contends that the testimony violates the following evidence rules: Best Evidence, Fed. R. Evid. 1002; Hearsay, Fed. R. Evid. 802; Lack of Foundation/Authentication, Fed. R. Evid. 901; Improper Expert Opinion, Fed. R. Evid. 702; and Summaries of Voluminous Records, Fed. R. Evid. 1006.

Plaintiff does not object to other portions of Ms. Kroll's testimony, including testimony that is based on her personal knowledge of what she did, saw, and understood during the pandemic. Ms. Kroll attests that she understood, based on internal and external data, that unvaccinated caregivers posed an increased risk of COVID-19 transmission to both patients and staff, and that, for that reason, various

---

[3] Plaintiff failed to confer with PeaceHealth about her evidentiary objections as required under LR 56-1(b). The failure to confer provides an independent ground to overrule Plaintiff's objections. *See, e.g., Bond v. Shriners Hosps. for Child.*, No. 3:20-cv-1943-SB, 2025 WL 868640, at *1 (D. Or. Mar. 20, 2025).

Page 10 – OPINION AND ORDER

medical and public health and government organizations were recommending vaccine mandates for healthcare workers. *See, e.g.*, Kroll Decl. ¶¶ 5–6, 12, 34. She also testified in detail about the processes that PeaceHealth followed in tracking, compiling, analyzing, discussing, and considering that data. *See* Def. Mot. at 3–15; Kroll Decl. ¶¶ 10, 14–22, 35; Riggs Supp. Decl. ¶ 4, Ex. C, Kroll Dep. 82:06–87:01, 155:05–157:03, ECF No. 76-3.

The Court overrules Plaintiff's objection as to any statement in paragraphs 25 through 34 of Ms. Kroll's declaration that does not refer to the specific internal epidemiologic data at issue. For example, the Court overrules Plaintiff's objection to the statement that "[h]ospital-acquired COVID-19 could prolong a patient's stay in one of [PeaceHealth's] facilities by days or weeks, further straining limited hospital resources." Kroll Decl. ¶ 30. The Court declines to rule on the admissibility of the other statements in paragraphs 25 through 34 and on Exhibit 3 because the Court need not rely on that testimony to resolve the summary judgment motion.

B.    *Plaintiff's Objection to Koekkoek Declaration*

Similarly, Plaintiff raises six evidentiary objections to Dr. Koekkoek's testimony. Plaintiff objects to paragraphs 23 and 50 of Dr. Koekkoek's declaration. In paragraph 23, Dr. Koekkoek attests:

> On August 16, 2021, using a system-wide process for investigating hospital-onset COVID-19 cases, PeaceHealth's Infection Prevention Department determined that PeaceHealth's patients were 7.1 times more likely to have been exposed to COVID-19 when they were cared for by an unvaccinated caregiver as compared to a vaccinated caregiver and 11.6 times more likely to get COVID-19 from an unvaccinated caregiver as compared to a vaccinated caregiver. This internal data confirmed that

> unvaccinated caregivers posed a much higher relative risk of spreading
> COVID-19 within PeaceHealth's facilities than vaccinated caregivers.

Koekkoek Decl. ¶ 23.  Paragraph 50 contains statements that pertain to the same internal epidemiologic data.

Plaintiff does not object to other portions of Dr. Koekkoek's testimony, including testimony that is based on his personal knowledge of what he did, saw, and understood during the pandemic nor to his expert testimony.  Dr. Koekkoek attests that he tracked and interpreted both internal and external data to determine that unvaccinated caregivers posed an increased risk of COVID-19 transmission to patients and staff.  *See, e.g.*, Koekkoek Decl. ¶¶ 15–22, 30, 36, 37–47.  He also testified in detail about the processes that the Ethical Discernment Team followed in tracking, compiling, analyzing, discussing, and considering that data.  *See* Def. Motion at 3–15; Koekkoek Decl. ¶¶ 16, 54; Riggs Supp. Decl. ¶ 3, Ex. B, Koekkoek Dep. 86:22–87:11; 258:07–259:04, 259:22–260:19, ECF No. 76-2.

The Court declines to rule on the admissibility of Dr. Koekkoek's statements in paragraphs 23 and 50 of his declaration because the Court need not rely on that testimony to resolve the summary judgment motion.

> C.    *Defendant's Objection to Whittaker Declaration*

PeaceHealth moves to strike Counsel Whittaker's declaration because it contains legal argument.  Def. Reply at 17–18 (citing Fed. R. Civ. P. 56(c)(4)), ECF No. 75.

Rule 56(c)(4) provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge [and] set out facts that would

Page 12 – OPINION AND ORDER

be admissible in evidence[.]"  Fed. R. Civ. P. 56(c)(4); *see also McElmurry v. US Bank Nat'l Ass'n*, No. CV-04-642-HU, 2005 WL 8177214, at *3 (D. Or. Dec. 1, 2005) ("Legal arguments or conclusions contained in declarations are improper and should be stricken.").

In his declaration, Counsel Whittaker argues how this case is distinguishable from similar cases in which PeaceHealth prevailed.  *See* Whittaker Decl. ¶¶ 2–4, ECF No. 66.

The Court finds that Counsel Whittaker's declaration contains impermissible legal argument, not facts based on counsel's personal knowledge.  For that reason, the Court strikes any legal arguments or conclusions contained in counsel's declaration.

### D.    *Defendant's Objection to Dr. Mina's Expert Testimony*

Plaintiff offers the expert testimony of Dr. Michael J. Mina, MD, Ph.D., who opines that PeaceHealth could have accommodated Plaintiff with N95 respirator and "regular testing" in lieu of vaccination.  Mina Decl. ¶ 33, ECF No. 67; *see also* Mina CV, Ex. 41, ECF No. 67-2.  Dr. Mina first filed a Report.  *See* Mina Decl., Ex. 7, Mina Report, ECF No. 67-1.  He then filed a Rebuttal Report.  *See id.*, Ex. 56, Mina Rebuttal, ECF No. 67-3.  Finally, he filed a declaration, which contains additional testimony.  *See* Mina Decl., ECF No. 67.  PeaceHealth moves to strike Dr. Mina's testimony as irrelevant and unreliable under *Daubert* and Federal Rule of Evidence 702.  Def. Reply at 3.

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Rule 702 permits a qualified expert to present testimony that "will help the trier of fact to understand the evidence or to determine a fact in issue," so long as (1) "the testimony is based on sufficient facts or data;" (2) "the testimony is the product of reliable principles and methods;" and (3) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593–94 (1993) ("[T]he trial judge must determine at the outset . . . whether the reasoning or methodology underlying the [expert] testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue."). The proponent of expert evidence must prove its admissibility by a preponderance of the evidence. *Daubert*, 509 U.S. at 592 n.10.

> 1.      *Dr. Mina's testimony is not relevant*

Rule 702 provides that expert testimony is admissible if it will "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Rule 702 also requires that "the expert's opinion reflect[] a reliable application of the principles and methods to the facts of the case." *Id.* That is, an expert's testimony must be relevant. "Federal judges must . . . exclude proffered scientific evidence under Rules 702 and 403 unless they are convinced that it speaks clearly and directly to an issue in dispute in the case, and that it will not mislead the jury." *Daubert v. Merrell Dow Pharms. Inc.*, 43 F.3d 1311, 1316, 1321 n.17 (9th Cir. 1995) (*Daubert II*) (quoting *Daubert*, 509 U.S. at 595).

Page 14 – OPINION AND ORDER

The only relevant basis for an employer's undue hardship decision is the information that was available to the employer at the time the decision was made. *Williams v. Legacy Health*, ____ F.4th ____, No. 24-5977, 2026 WL 1239760, at *4 (9th Cir. May 6, 2026). The undue hardship decision here was made in August 2021.

In his reports and declaration, Dr. Mina opines that PeaceHealth could have accommodated Plaintiff with an N95 respirator and "regular testing" because she would have posed a "markedly lower risk of infecting others" than a vaccinated individual. Mina Decl. ¶¶ 22, 31; *see also* Mina Report at 4.1.12, 5.1.2, 5.1.3, 5.2.4; Mina Rebuttal at 5–6. Dr. Mina does not dispute the vaccine's efficacy in preventing "symptomatic disease, hospitalization, and death" in vaccinated individuals. Mina Decl. ¶¶ 12, 25; Mina Report 4.1.2. He disputes only its efficacy in preventing transmission. Dr. Mina opines that, after the appearance of the Delta and Omicron COVID variants, vaccinated individual were subject to waning immunity and breakthrough infections that made them infectious. *Id.* ¶¶ 11–13; Mina Report at 5.1.1, 5.1.2; Mina Rebuttal at 2–3. He further opines that "any reasonable medical professional with Dr. Koekkoek's credentials would have known by August 2021" that "[COVID-19] vaccination [did not] materially reduce[] transmission risk." *Id.* ¶ 11; *see also id.* ¶¶ 20, 23, 31, 32, 35 (similar statements); Mina Report at 5.2.5; Mina Rebuttal at 2, 5–6.

PeaceHealth offers the testimony of its expert, Dr. Seth Cohen, MD, MSc. *See* Riggs Decl. ¶ 7, Ex. 6, Cohen Report, ECF No. 62-6; *id.* ¶ 8, Ex. 7, Cohen CV, ECF 62-7; Riggs Supp. Decl. ¶ 7, Ex. F, Cohen Rebuttal, ECF No. 76-6. PeaceHealth first

Page 15 – OPINION AND ORDER

contends that Dr. Mina "does not cross reference the relevant portions of his reports, if any, to show if statements are tethered to any scientific or medical sources at all— because there are none[.]" Def. Reply at 5–6, 5 n.2. PeaceHealth also maintains that "with three limited exceptions," Dr. Mina's sources were not available as of September 1, 2021. *Id.* at 5–6 (citing Cohen Rebuttal ¶¶ 4, 41).

On reviewing Dr. Mina's three documents, the Court finds that Dr. Mina makes scant cross-reference to scientific or medical sources. In his rebuttal report, Dr. Mina provides sources in six footnotes on page 3. *See* Mina Rebuttal at 5, n.3, 5, 6, 7, 8, 9. Under Federal Rule of Evidence 201, the Court takes judicial notice of scientific studies published in well-known academic journals such as the New England Journal of Medicine because the date and content of such studies "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Each of the sources cited in Dr. Mina's rebuttal report was published between 2022 and 2024. These sources would not have been available to PeaceHealth in August 2021 when it made the undue hardship decision at issue here.

In his initial report, Dr. Mina provides a bibliography that lists 35 sources, but he does not provide complete citations including dates or exhibits for those sources. *See* Mina Report at 5–8. In response, PeaceHealth produced a chart that contains proper citations, including internet links, for Dr. Mina's sources. *See* Riggs Supp. Decl. ¶ 2, Ex. A., Sources Cited by Dr. Mina, ECF No. 76-1. Plaintiff objects to this exhibit, among others, as "sandbagging" and argues that the Court should strike it

Page 16 – OPINION AND ORDER

because PeaceHealth improperly "submit[s] an entirely new evidentiary record[.]" Pl. Sur-Reply at 23–24, ECF No. 79. But the exhibits[4] attached to PeaceHealth's Reply Brief including the chart of Dr. Mina's sources, are not new facts; they are directly responsive to the arguments raised in Plaintiff's opposition and simply "provide[] the full context to [Plaintiff's] selected recitation of the facts." *Terrell v. Contra Costa Cnty.*, 232 F. App'x 626, 629 n.2 (9th Cir. 2007). As to the chart, Dr. Mina had already introduced those sources into the record in his bibliography. Even assuming that the Reply Brief contains new evidence, Plaintiff had an opportunity to respond to that evidence in her Sur-Reply. "Where new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the non-movant an opportunity to respond." *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) (cleaned up).

As this dispute highlights, there are two issues with Dr. Mina's testimony. First, Dr. Mina fails to sufficiently cross-reference the factual statements in his opinion with the relevant sources. Nothing in either *Daubert* or the Federal Rules of Evidence "requires a district court to admit opinion evidence that is connected to existing data only by the [say so] of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

---

[4] The other exhibits attached to PeaceHealth's Reply Brief include Dr. Cohen's rebuttal report; additional excerpts from depositions that both parties had already introduced into the record; an exhibit of a study that Dr. Mina discusses in his reports; and exhibits that Dr. Mina authenticated at deposition—statements that Dr. Mina made in 2020 through 2022. *See* Riggs Supp. Decl., ECF No. 76.

Second, with few exceptions, Dr. Mina's sources were not available in August 2021. The undue hardship analysis is confined to the information available to the employer when it made its undue hardship decision. *Lavelle-Hayden v. Legacy Health*, 744 F. Supp. 3d 1135, 1152 (D. Or. 2024). A court may not consider that decision "with the clarity of hindsight or the benefit of post-pandemic debates over what measured responses frontline employers should have taken." *Petersen v. Snohomish Reg'l Fire & Rescue*, 150 F.4th 1211, 1222 (9th Cir. 2025). In *Williams*, the Ninth Circuit rejected "'hindsight' reasoning" and asked instead "whether the employer . . . 'acted reasonably' in relying 'on the objective, scientific information available to it[.]'" *Williams*, 2026 WL 1239760, at *3 (quoting *Rodrique v. Hearst Commc'ns, Inc.*, 126 F.4th 85, 91 (1st Cir. 2025)).

To the extent that Dr. Mina's opinion is based on scientific or medical sources that were unavailable to PeaceHealth when it made its undue hardship decision in August 2021, that testimony is irrelevant and is properly excluded. *See, e.g.*, *Zimmerman v. PeaceHealth*, No. 3:22-cv-05960, 2025 WL 2458051, at *17 (W.D. Wash. Aug. 26, 2025) (excluding Harvard-trained expert's opinion, that was "based largely on data obtained after PeaceHealth's mid-August 2021 decision to place [p]laintiffs on leave").

Accordingly, any part of Dr. Mina's opinion that is not based on scientific or medical data that was available in August 2021 is irrelevant and inadmissible under *Daubert* and Rule 702.

   2.    *Dr. Mina's Testimony is not reliable*

Defendant contends that Dr. Mina's testimony is not reliable because (1) the timeframe-relevant scientific and medical sources on which Dr. Mina relies do not support his opinion, and (2) the scientific and medical consensus in August 2021 also do not support his opinion. Def. Reply at 4–5, 9. PeaceHealth maintains that Dr. Mina's opinions are impermissibly "tainted by hindsight bias." *Id.* at 4.

Trial judges are charged with ensuring that "any and all . . . [expert] evidence admitted is not only relevant, but reliable." *Daubert,* 509 U.S. at 589. "A district court cannot be silent about reliability when challenged." *United States v. Holguin,* 51 F.4th 841, 854 (9th Cir. 2022). To be reliable, expert testimony must be "based on sufficient facts or data[,]" *i.e.,* on external objective sources, not on "subjective belief or unsupported speculation." *Daubert,* 509 U.S. at 590 (quoting Fed. R. Evid. 702). And an expert must show the court that they have used reliable methodology based on those facts and data to reach their conclusions. *In re Phenylpropanolamine (PPA) Products Liability Litigation*, 289 F. Supp. 2d 1230, 1238 (W.D. Wash. 2003) ("[E]xperts must explain the process by which they reached their conclusions and identify some type of objective source demonstrating their adherence to [sound methodology].").

   a.    *Dr. Mina's opinion is not supported by the relevant sources*

Dr. Mina contends that, in August 2021, PeaceHealth knew or should have known that N95 respirators and "regular testing"—not vaccination—"were the best tools available" to stop viral spread. Mina Decl. ¶¶ 41, 11–13, 14, 19, 25–28. Dr.

Mina does not dispute that the vaccine was effective in preventing "symptomatic disease, hospitalization, and death" in vaccinated individuals.  Mina Decl. ¶¶ 12, 25. He contends only that the vaccine was ineffective in preventing transmission.  Dr. Mina opines that, in August 2021, the CDC considered pre-Delta vaccine transmission assumptions to be "outdated."  *Id.* ¶ 27; Mina Report at 4.1.9, 8.1.7; Mina Rebuttal at 4.  To support his opinion, he cites three timeframe-relevant scientific sources—all published by CDC: the "Barnstable County Outbreak Report," Mina Decl. ¶ 13, and two "approximately July 29, 2021" CDC guidance documents, *id.* ¶ 14.

Dr. Mina's first source, "The Barnstable County Outbreak Report" ("Outbreak Report"),[5] is a CDC report that describes a "significant COVID transmission that occurred during the summer of 2021 in one Massachusetts town related to large public gatherings."  Def. Reply at 6 (quoting Cohen Rebuttal ¶ 21); Riggs Supp. Decl., Ex. I, Outbreak Report, at 2, ECF No. 76-9.  The Outbreak Report found that 74% (or 346) of the COVID-19 cases in Barnstable County during the summer of 2021 occurred in "fully vaccinated persons."  Ex. I, Outbreak Report, at 1.  Dr. Mina opines that the Outbreak Report data was "the best available evidence regarding the transmissibility of Delta in vaccinated individuals."  Mina Decl. ¶ 28; *see also id.* ¶ 13

---

[5] Though Dr. Mina cited the CDC's Outbreak Report, he did not provide a proper citation or exhibit.  PeaceHealth submitted a citation and copy of that report, Exhibit I.  *See* Riggs Supp. Decl. ¶ 10, Ex. I, Outbreak Report, ECF No. 76-9. Catherine M. Brown, et al., *Outbreak of SARS-CoV-2 Infections, Including COVID-19 Vaccine Breakthrough Infections, Associated with Large Public Gatherings— Barnstable County, Massachusetts, July 2021*, MMWR 70(31):1059–1062 (Aug. 6, 2021), https://doi.org/10.15585/mmwr.mm7031e2.

Page 20 – OPINION AND ORDER

(opining that the Outbreak Report "led the CDC Director . . . to update guidance . . . that vaccination would not be likely to stop transmission").  But PeaceHealth's expert Dr. Cohen opines that the Outbreak Report "was not intended or designed to estimate the risk of transmission or acquisition from people who are fully vaccinated" because it was a "large population based observational study[,]" not a "randomized controlled trial."  Cohen Rebuttal ¶ 21; *see also* Ex. I, Outbreak Report, at 1–2.  Dr. Mina ignores the authors' warning that "data from this report are insufficient to draw conclusions about the effectiveness of COVID-19 vaccines against SARS-CoV-2, including the Delta variant, during this outbreak."  Ex. I, Outbreak Report, at 3.  And the Report nowhere discusses masking and testing or any other mitigation method as an alternative to vaccination.  Instead, it recommends that masking be used in addition to vaccination at large indoor public events "given the potential risk of infection during attendance at large public gatherings that include travelers from many areas with differing levels of transmission."  Ex. I, Outbreak Report, at 2.  For these reasons, this Court and others have determined that testimony as to vaccine efficacy based on this report is unreliable and have excluded such testimony in prior similar cases.[6]

---

[6]   *See, e.g., Sano v. PeaceHealth, Inc.*, No. 6:22-cv-01210-MTK, 2024 WL 4979429, at *4 (D. Or. Dec. 4, 2024) ("specious use of the Outbreak Report undermines the reliability of [the expert's] methods and reasoning"); *see also Zimmerman v. PeaceHealth*, 701 F. Supp. 3d 1099, 1113 (W.D. Wash. 2023) (finding that plaintiffs' citation of the Outbreak Report to support their contention that "the Delta infection resulted in similarly high . . . viral loads in vaccinated and unvaccinated people" was "misleading"); *Gemmrig v. Asante Three Rivers Med. Ctr., LLC*, No. 1:22-CV-01814-AA, 2025 WL 2555337, at *2 and n.2 (D. Or. Sept. 5, 2025) (excluding expert testimony based on the Barnstable County Massachusetts report because that data

Dr. Mina's second and third sources are CDC COVID-19 guidance documents from late July 2021: a slide deck (July 29, 2021) and a CDC article (July 30, 2021).[7] Mina Decl. ¶ 14; *see* Koekkoek Decl., Ex. 15, July 29 CDC slide deck, ECF No. 59-15; *id.*, Ex. 16, July 30 CDC Report, ECF No. 59-16. Dr. Mina opines that these sources show that in July 2021 "[t]he CDC acknowledged . . . that because of breakthrough infections . . . stakeholders [should not] expect that vaccines would indicate a lack of infectivity and transmissibility." *Id.* ¶ 13.

The July 29 CDC report (slide deck) states that "[v]accines prevent >90% of severe disease but *may* be less effective at preventing infection or transmission" and "[b]reakthrough infections *may* be as transmissible as unvaccinated cases" (emphasis added). Ex. 15, July 29 CDC slide deck, at 22. Dr. Koekkoek opines that CDC's tentative language (the use of the word "may") reflected CDC's consideration of emerging data but that CDC at that time had not changed its pre-Delta vaccination recommendation. Koekkoek Decl. ¶ 42; *see also* Riggs Supp. Decl., Ex. G, Mina Dep. 194:08–195:24 (admitting that the word "may" means "uncertainty"), ECF No. 76-7.

---

was "misleadingly cite[d] . . . without context"); *Malone v. Legacy Health*, No. 3:22-cv-01343-HZ, 2024 WL 3316167, at *3 (D. Or. July 5, 2024); *Krone v. Legacy Health*, No. 3:22-cv-01986-AR, 2025 WL 1582793, at *5 (D. Or. May 6, 2025), *appeal dismissed,* No. 25-4132 (9th Cir. Oct. 6, 2025).

[7] These sources were also cited by PeaceHealth and provided as exhibits. *See* Koekkoek Decl. ¶ 42, Ex. 15, ECF No. 59-15 (CDC, *Improving communications around vaccine breakthrough and vaccine effectiveness*, (July 29, 2021)); *id.* ¶ 43, Ex. 16, ECF No. 59-16 (Athalia Christie, et al., *Guidance for Implementing COVID-19 Prevention Strategies in the Context of Varying Community Transmission Levels and Vaccination Coverage*, MMWR 70(30):1044–1047 (Jul. 30, 2021), https://www.cdc.gov/mmwr/volumes/70/wr/mm7030e2.htm); *see also* Riggs Supp. Decl. ¶ 2, Ex. A, Table of Mina Sources at 2.

Page 22 – OPINION AND ORDER

The report concludes that "next steps for CDC" are to "consider vaccine mandates for [healthcare personnel] to protect vulnerable populations" and to institute "[u]niversal masking for source control and prevention."  Ex. 15, July 29 CDC slide deck, at 23.

Further, though the July 29 CDC report included emerging data about breakthrough infections, it also contained data that showed that breakthrough cases were less contagious.  "The CDC highlighted that, as compared to unvaccinated cases, vaccinated cases had lower viral loads, shorter duration of detectable viral RNA, lower risk of febrile symptoms, and shorter mean duration of symptoms."  Koekkoek Decl. ¶ 42; *see* Ex. 15, CDC slide deck, at 7.  Dr. Cohen opines that several Delta-era studies similarly found that "[b]reakthrough infections in vaccinated individuals, when they did occur, tended to have lower viral loads and shorter infectious periods, making them less contagious than infections in unvaccinated individuals (a finding reported in multiple studies, and reflected in milder illness courses)."  Cohen Rebuttal ¶ 11 (citing August 13, 2021 CDC report)[8];  *see also* Cohen Report ¶ 23 (explaining that "several influential [Delta-era] studies . . . demonstrated that vaccinated patients with breakthrough infections had faster clearance times [which] means that the amount of virus detectable in the nasopharynx ('viral load') became undetectable sooner, coinciding with shorter duration of infection" and "less opportunity for transmission" and providing citations for those studies).[9]

---

[8] Alyson M. Cavanaugh, et al., *Reduced Risk of Reinfection with SARS-CoV-2 After COVID-19 Vaccination - Kentucky, May-June 2021*, MMWR 70(32):1081–1083 (Aug. 13, 2021), https://doi.org/10.15585/mmwr.mm7032e1.

[9] Stephen M. Kissler, et al., *Viral Dynamics of SARS-CoV-2 Variants in Vaccinated and Unvaccinated Persons*, N. ENG. J. MED. 385(26):2489-91 (Dec. 23,

In sum, as to the July 29 CDC report, Dr. Koekkoek opines that "[his] takeaway . . . was that transmissibility was going to be less with vaccinated individuals, masking was going to be more important for everybody than previously understood, and vaccination was still the strongest tool available." Koekkoek ¶ 42. In August 2021, PeaceHealth already required employees to mask and knew that N95 respirators were likely more effective than surgical masks but could not obtain a sufficient supply of them. *Id.* ¶ 55 ("PeaceHealth . . . followed the requirements of OHA and Oregon OSHA and aligned with CDC guidance on masking."). Dr. Koekkoek further opines that "[t]he medical and scientific consensus at the time was that additional precautions, such as vaccination and more stringent masking protocols, should be implemented—not that any precautions should be relaxed." *Id.* ¶ 54.

Dr. Mina's third relevant source, the July 30 CDC report, states that "[t]he most important public health action to end the pandemic remains increasing vaccination coverage, which saves lives, prevents illness, and reduces the spread of COVID-19." Ex. 16, July 30 CDC Report, ECF No. 59-16, at 3. And the report concluded that "[t]he emergence of more transmissible SARS-CoV-2 variants,

---

2021), https://doi.org/10.1056/NEJMc2102507; Po Ying Chia, et al., *Virological and Serological Kinetics of SARS-CoV-2 Delta Variant Vaccine Breakthrough Infections: A Multicentre Cohort Study*, CLINICAL MICROBIOLOGY AND INFECTION 28(4): 612.el-612.e7 (Apr. 1, 2022), https://doi.org/10.1016/j.cmi.2021.11.010; Anika Singanayagam, et al., *Community Transmission and Viral Load Kinetics of the SARS-CoV-2 Delta (B.1.617.2) Variant in Vaccinated and Unvaccinated Individuals in the UK: A Prospective, Longitudinal, Cohort Study*, LANCET INFECT DIS 22(2):P183–95 (Feb. 2022), https://www.thelancet.com/journals/laninf/article/PIIS1473-3099(21)00648-4/fulltext.

Page 24 – OPINION AND ORDER

including Delta, *increases the urgency to expand vaccination coverage* and . . . to collaboratively monitor the status of the pandemic in their communities and continue to apply layered prevention strategies to minimize preventable illness and death." *Id.* at 4 (emphasis added).

In sum, even though the July 29 CDC report, like the Outbreak Report, contained emerging data as to breakthrough infections in vaccinated individuals, CDC continued to recommend—as noted in the same slide deck—that vaccine mandates be considered for healthcare personnel. And the July 30 CDC report concluded that Delta "increase[d] the urgency to expand vaccination coverage." Not one of Dr. Mina's sources recommended N95 respirators and "regular testing" in lieu of vaccination to control COVID-19, even after the appearance of Delta and the increase in breakthrough infections. Instead, masking was recommended only as an adjunct to vaccination. The Court concludes that the three timeframe-relevant CDC sources on which Dr. Mina relies do not support his opinion.

Dr. Mina cites two other sources that are close to the relevant timeframe, but they also do not support his opinion. First, Dr. Mina cites a December 2021 "transmission study" among "vaccinated and unvaccinated individuals in the National Basketball Association 'bubble.'"[10] Mina Report at 7.4.6. Dr. Mina opines that the NBA was able to "remain operational through the pandemic largely because of the strong benefits of frequent routine testing to stop outbreaks." *Id.* The NBA

---

[10] Stephen M. Kisser, et al., *Viral Dynamics of SARS-CoV-2 Variants in Vaccinated and Unvaccinated Persons*, N. ENG. J. MED. 385:2489–91 (Dec. 1, 2021), https://www.nejm.org/doi/full/10.1056/NEJMc2102507.

Page 25 – OPINION AND ORDER

bubble was an isolated campus in Orlando, Florida during July–October 2020 that imposed on players, staff, and officials, a strict quarantine, daily PCR testing, and symptom screening. Cohen Rebuttal ¶ 23. Unlike the NBA, PeaceHealth did not quarantine its employees and its patients in its facilities. What the NBA did under quarantine conditions does not apply here. For that reason, the NBA bubble study does not support Dr. Mina's opinion.

Finally, Dr. Mina also cites a "large household transmission study" as evidence that the vaccine confers "no statistical benefit . . . in terms of chances of acquiring the virus." Mina Report at 7.3.6. The study was posted online in December 2021 as a non-peer-reviewed "preprint" and only became available in a peer-reviewed journal in 2022. Cohen Rebuttal ¶ 20. It was not available in August 2021. *Id.* Even so, its conclusions contradict Dr. Mina's opinion. *Id.* (quoting the study's conclusions).[11]

> b.    *Dr. Mina's opinion is not supported by the August 2021 scientific consensus*

Dr. Cohen opines that, in August 2021, the scientific and medical consensus supported vaccine mandates because "vaccination was the single most effective tool

---

[11] Frederik Plesner Lyngse, et al., *Household transmission of SARS-CoV-2 Omicron variant of concern subvariants BA.1 and BA.2 in Denmark*, NAT COMMUN 13:5760 (Sep. 30, 2022), https://doi.org/10.1038/s41467-022-33498-0 (concluding that "[b]oth booster-vaccinated individuals and fully-vaccinated individuals had reduced susceptibility to [Omicron] infection and infectiousness compared to unvaccinated individuals . . . suggesting that the effectiveness of vaccines remains significant. . . . [likely due to] a shorter period of viral shedding[]" and also concluding that "[s]tudies from China and the United States also indicate that vaccination shortens the duration of time of high transmission potential, minimizes symptom duration, and furthermore may restrict tissue dissemination of active virus"). *See* Cohen Rebuttal ¶ 20 (providing study excerpts).

Page 26 – OPINION AND ORDER

available for mitigating the spread of SARS-Co V-2 among healthcare personnel and their patients[,]" *id.* ¶ 34; *see also id.* ¶ 28 (citing contemporaneous data as to vaccine efficacy); *id.* ¶¶ 30–33 (citing contemporaneous data as to vaccine protection of healthcare workers and patients); Koekkoek Decl. ¶¶ 37–47, Exs. 13–21 (citing similar data).

Dr. Mina agrees that the August 2021 data showed that vaccines, unlike other mitigation methods, were effective in preventing severe illness and death from SARS-CoV-2.  Mina Decl. ¶¶ 12, 25; Cohen Report ¶ 26.  Dr. Mina disputes vaccine efficacy only as to transmission.  He opines that the "scientific data available to PeaceHealth . . . clearly indicated that N95 masking and regular testing," not vaccination, "were the best tools available to protect the unvaccinated from becoming infected with[] and transmitting COVID Delta and later Omicron."  Mina Decl. ¶ 41.

Dr. Cohen does not dispute that, during Delta, vaccinated individuals were subject to breakthrough infections, but he opines that "even during the Delta wave, vaccination still provided a substantial reduction in infection risk." Cohen Rebuttal ¶ 9 (citing contemporaneous data).[12]  He opines that, even when breakthrough occurred, transmission was reduced due to "shorter infectious periods" attributed to

---

[12] Ashley Fowlkes, *Effectiveness of COVID-19 Vaccines in Preventing SARS-CoV-2 Infection Among Frontline Workers Before and During B.1.617 .2 (Delta) Variant Predominance - Eight U.S. Locations, December 2020–August 2021*, 70 MMWR 34:1167-1169 (Aug. 27, 2021), https://doi.org/10.15585/mmwr.mm7034e4; Amelia G. Johnson, et al., *COVID-19 Incidence and Death Rates Among Unvaccinated and Fully Vaccinated Adults with and Without Booster Doses During Periods of Delta and Omicron Variant Emergence - 25 U.S. Jurisdictions, April 4-December 25, 2021*, MMWR 71(4):132-138 (Jan. 28, 2022), https://doi.org/10.15585/mmwr.mm7104e2.

lower viral loads, faster viral clearance, and shorter symptom duration, *id.* ¶ 11 (citing contemporaneous data)[13]; *see also* Cohen Report ¶ 23 (same).  Further, CDC continued to urge vaccination and supported vaccine mandates for healthcare personnel despite evidence of breakthrough infections.  *See* Ex. 15, July 29 CDC slide deck, at 23; Ex. 16, July 30 CDC Report, at 3.  In July and August 2021, CDC recommended masking as an adjunct to, not a substitute for, vaccination.  Ex. 15, July 29 CDC slide deck, at 23; Ex. I, Outbreak Report, at 2.

In August 2021, professional medical and public health organizations and government agencies also recommended vaccine mandates for healthcare workers. *See* Koekkoek Decl.¶ 20 (American Nurses Association ("ANA"), ¶¶ 19, 30 (hospital systems including OHSU and professional organizations), ¶ 42 (citing CDC recommendations to implement vaccine mandates for healthcare workers), *id.* ¶¶ 35, 36, 47, 48, 55, 63 (citing OHA rules and recommendations); Cohen Report ¶ 42 (citing "consensus from leading medical organizations" such as ANA, American Hospital Association, Society for Healthcare Epidemiology of America and others); Cohen Rebuttal ¶¶ 37 (citing the recommendations of AMA, American Nurses Association, American Academy of Pediatrics); *id.* ¶ 38 (citing Centers for Medicare & Medicaid Services' ("CMS") interim final rule requiring COVID-19 vaccination for workers at Medicare & Medicaid certified facilities); *see also* Riggs Supp. Decl., Ex. E, Cohen Dep. 79:03–79:23, ECF No. 76-6 (opining that PeaceHealth's vaccine mandate was

---

[13] Alyson M. Cavanaugh, et al., *Reduced Risk of Reinfection with SARS-CoV-2 After COVID-19 Vaccination - Kentucky, May-June 2021*, 70 MMWR 32:1081-1083 (Aug. 13, 2021), https://doi.org/10.15585/mmwr.mm7032e1.

"medically justified" because it was supported by the "scientific literature at the time" and also by "the opinions of public health professionals, respected bodies like the CDC, and then codified into regulation which was also supported by scientific evidence by OHA, CMS Final Rule and OSHA").

Finally, in 2021, when Dr. Mina was still a professor at the Harvard School of Public Health,[14] he also appears to have supported vaccine mandates:

> I try to stay away from giving an opinion of whether mandates, mandates are a policy issue, they're based on decisions that are outside of my area of expertise with regard to law and sociology and social structures and things like that . . . But from a public health perspective, getting as many people vaccinated, vaccination and testing is a public health good . . . it is much more about stopping that individual from spreading to other people, whether that's testing or vaccination . . . I think my personal opinion is that getting as many people vaccinated as quickly as possible benefits everyone.

Cohen Rebuttal ¶ 6 (quoting HARVARD SCHOOL OF PUBLIC HEALTH, *Coronavirus (COVID-19): Press Conference with Michael Mina, 12/18/20* (Dec. 18, 2020), https://hsph.harvard.edu/news/coronavirus-covid-19-press-conference-with-michael-mina-12-18-20/); *see also id.* ¶ 8 (providing Dr. Mina's February 2021 statement: "I think all of it adds up to suggest that vaccinated individuals on a whole will likely have a lower sort of a propensity to transmit the virus in large quantities to others.");[15] *id.* ¶ 27 (providing Dr. Mina's December 2020 statement: "[F]rom a purely transmission

---

[14] Dr. Mina left his position at Harvard in 2021 to take a series of full and parttime positions at numerous biomedical and pharmaceutical device companies, including companies that manufacture testing products. *See* Mina CV, ECF No. 67-2.

[15] HARVARD SCHOOL OF PUBLIC HEALTH, *Coronavirus (COVID-19): Press Conference with Michael Mina, 02/12/21* (Feb. 12, 2021), https://hsph.harvard.edu/news/coronavirus-covid-19-press-conference-with-michael-mina-02-12-21/.

of this virus perspective . . . [t]he more people we can get vaccinated, especially as we vaccinate clusters of people, surely that would help.");[16] *id.* ¶ 39 (explaining that in "late 2021," Dr. Mina signed an AMA statement supporting vaccine mandates, a statement that provided: "To overcome COVID and the highly transmissible Delta variant, and return to 'normal,' we need to substantially increase the vaccination rate from its current level of under 60 percent.");[17]  *id.* ¶ 37 (providing Dr. Mina's early 2021 statement: "We have huge numbers of people dying, and so if we can . . . If I could snap my fingers right now and say that I want half of America to be vaccinated, then I would absolutely do that because that would generally stop the spread of the virus at the moment.  So[,] the quicker we can do this, the quicker we will start to see cases decrease.");[18] *id.* ¶ 29 (providing Dr. Mina's November 2021 statement: "The nice thing about testing is it's a complement, not a substitute [to vaccination] in any way, shape, or form.");[19] *id.* ¶ 32 (providing, from the same November 2021 article, Dr. Mina's statement: "In the United States, we don't have the scale of testing. We

---

[16] HARVARD SCHOOL OF PUBLIC HEALTH, *Coronavirus (COVID-19): Press Conference with Michael Mina, 12/18/20* (Dec. 18, 2020), https://hsph.harvard.edu/news/coronavirus-covid-19-press-conference-with-michael-mina-12-18-20/.

[17] Press Release, AMA, *AMA Joins Healthcare Experts in Supporting OSHA COVID-19 Vaccine Mandates* (Nov. 18, 2021), https://www.ama-assn.org/press-center/ama-press-releases/ama-joins-health-care-experts-supporting-osha-covid-19-vaccine

[18] Harvard School of Public Health, *Coronavirus (COVID-19): Press Conference with Michael Mina, 01/15/21* (Jan. 15, 2021), https://hsph.harvard.edu/news/coronavirus-covid-19-press-conference-with-michael-mina-01-15-21/.

[19] HARVARD MAGAZINE, *Ask a Harvard Professor with Michael Mina* (Nov. 1, 2021), https://www.harvardmagazine.com/2021/11/michael-mina.

Page 30 – OPINION AND ORDER

don't have the manufacturing capacity, with the handful of companies that have been authorized, to create those market forces.").[20]

In sum, the August 2021 scientific consensus provides no support for Dr. Mina's opinion that PeaceHealth could have accommodated Plaintiff and hundreds of other employees with N95 respirators and "regular testing" in lieu of vaccination without increasing the health and safety risks to its employees and to its patient population.

Further, Dr. Mina fails to address the practical shortcomings of using N95 respirators and "regular testing."  He does not meaningfully address the common-sense observation that respirators do not work if they are not worn properly and continuously and that employees need to remove them to eat or drink and would likely even remove them to ease discomfort—events that could happen repeatedly during a single eight-hour shift.  *See* Mina Decl. ¶ 30 (asserting, without support or analysis, that "any sort of human error in donning PPE" be "weigh[ed] . . . against a parallel 'immunological susceptibility' of vaccine waning").  Nor does Dr. Mina address feasibility issues, such as the need to monitor proper and continuous respirator use by hundreds of employees or the difficulty of obtaining a sufficient supply of respirators.  *See* Koekkoek Decl. ¶ 32 (explaining, in the summer of 2021, PeaceHealth "had difficulty ensuring an adequate supply of N95 [respirators]" because "supply chains were strained and inconsistent").

---

[20] *Id.*

At deposition, Dr. Mina opines that "regular testing" means daily testing. Mina Dep. 46:07–46:16.    He opines that to effectively protect against viral transmission, testing would have to be done daily, ideally pre-shift, and "every spacing of that becomes slightly less efficacious[.]"  *Id.*    He further opines that test results would have to be returned "in a reasonable amount of time, usually 24 hours or less, . . . there's a tradeoff, high frequency testing, slower turnaround testing—you can trade those off[.]"  *Id.* at 46:21–47:06.  Dr. Cohen opines that, in August 2021, the literature did not support that "routine testing programs [were] equivalent or more effective than vaccination in controlling COVID-19."   Cohen Rebuttal ¶ 29.  Dr. Koekkoek attests that "[t]o [his] knowledge, no relevant state or federal public health agency ultimately required routine PCR or rapid-antigen testing for all healthcare workers or as an accommodation for unvaccinated workers."  Koekkoek Decl. ¶ 56.

Dr. Cohen further opines that testing, like masking, "is a reactive measure that mitigates spread after someone has already become infected" as opposed to vaccination, which is a "proactive measure that markedly lowers the baseline risk," *id.* ¶ 30, that infected individuals may not test positive until several days into their infection[,] *id.* ¶ 31, that "testing is not perfectly accurate[,]" that "false positives are . . . not uncommon[,]" that turnaround times are variable, *id.* ¶ 31, and that during the relevant timeframe the US did not have the requisite testing capacity, *id.* ¶ 32. Dr. Mina fails to address these facts.  Nor does he address the feasibility of repeatedly testing and monitoring results for hundreds of employees or the supply chain issues that restricted testing capacity during that time.  Dr. Koekkoek attests that "it would

Page 32 – OPINION AND ORDER

have been extremely difficult, if not impossible, logistically to operationalize daily or weekly routine testing on a grand scale[,]" and that "[PeaceHealth] had difficulty consistently acquiring sufficient supplies and capacity for diagnostic testing on a systemwide basis."  Koekkoek Decl. ¶ 56; *see also* Kroll Decl. ¶ 21(d) (explaining that PeaceHealth did not have enough laboratory PCR testing capacity).  Dr. Mina admitted that, in 2021, the U.S. lacked sufficient testing capacity.  *See* Mina Dep. 97:18–98:25 (acknowledging efforts in late 2021 to build up testing capacity due to a nationwide shortage of tests); *see also* Riggs Supp. Decl., Ex. K, at 8 (HARVARD MAGAZINE, *Ask a Harvard Professor with Michael Mina* (Nov. 1, 2021)), ECF No. 76-11 (opining that demand for rapid tests "has far outstripped supply" and that the U.S. lacks manufacturing capacity); *id.*, Ex. J (Michael Mina & Steven Phillips, *The U.S. Needs an Operation Warp Speed for Rapid COVID-19 Testing*, TIME (Sep. 10, 2021)), ECF No. 76-10 (opining as to the lack of U.S. testing capacity); *id.,* Ex. M, at 3 (Yuki Noguchi, *Why Rapid COVID Tests are in Short Supply in the U.S.*, NPR (Dec. 27, 2021)), ECF No. 76-13 (quoting Dr. Mina: "The early lack of federal investment in rapid testing was a pivotal mistake.").

In sum, the Court concludes that Dr. Mina's expert testimony is unreliable because it is not based on sufficient facts or data and because it is not the product of reliable scientific methodology.  First, Dr. Mina bases his opinion mainly on data that emerged after the relevant timeframe.  Dr. Mina cites only three timeframe-relevant sources—all published by CDC.  Not one of those sources supports Dr. Mina's opinion.  In fact, all three sources contradict his opinion.  Though reporting emerging data,

Page 33 – OPINION AND ORDER

each CDC source contains strong concluding statements that support vaccination as the primary strategy to control COVID-19, even during Delta.  Masking is mentioned only as a secondary mitigation measure.  "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  *Joiner*, 522 U.S. at 146.  That is the case here.

Second, Dr. Mina's opinion is not the product of reliable scientific methodology. "[T]he test under *Daubert* is not the correctness of the expert's conclusions but the soundness of [the] methodology."  *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010), *as amended* (Apr. 27, 2010) (quoting *Daubert*, 509 U.S. at 595).  Dr. Mina not only mischaracterizes the July and August 2021 CDC data, but he also cherry-picks the emerging data from those reports (and from later literature) and ignores the contemporaneous CDC recommendations and counter evidence—including evidence he subscribed to when he was still a professor at the Harvard School of Public Health in 2021.  An expert must show the court that they have used reliable methodology based on facts and data to reach their conclusions.  *In re Phenylpropanolamine (PPA) Products Liability Litigation*, 289 F. Supp. 2d at 1238. "Cherry-picking" facts and data, as Dr. Mina has done, "undermines principles of the scientific method and is a quintessential example of applying methodologies (valid or otherwise) in an unreliable fashion."  *In re Onglyza (Saxagliptin) & Kombiglyze (Saxagliptin & Metformin) Prods. Liab. Litig.*, 93 F.4th 339, 347 (6th Cir. 2024); *see also Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 269 (2d Cir. 2002) (where the flaw in the

Page 34 – OPINION AND ORDER

expert's methodology is large enough that the expert lacks "good grounds" for the conclusion, the opinion is inadmissible).

For these reasons, the Court grants PeaceHealth's motion to strike Dr. Mina's testimony.

II.    *Religious Accommodation Claim*

Plaintiff brings a failure-to-accommodate claim against her former employer PeaceHealth under Title VII and ORS 659A.030.  In August 2021, Plaintiff applied for and was granted a religious exception to PeaceHealth's vaccination mandate. Plaintiff was placed on unpaid administrative leave.  Plaintiff alleges that she was effectively terminated.  *See* Compl. ¶¶ 13, 17–18, 22–23, 27–28.  Plaintiff contends that PeaceHealth could have accommodated her by allowing her to work in person with an N95 respirator and "regular testing."  Pl. Resp. at 30.

PeaceHealth moves for summary judgment on the undue hardship defense.

Under Title VII, it is unlawful for an employer . . . "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion[.]"  42 U.S.C. § 2000e-2(a)(1). ORS 659A.030 provides a state analogue.  "Because [ORS] 659A.030 is modeled after Title VII, [a] plaintiff's state law discrimination claim can be analyzed together with her federal discrimination claim."  *Pullom v. U.S. Bakery*, 477 F. Supp. 2d 1093, 1100 (D. Or. 2007).

To establish religious discrimination on the basis of a failure-to-accommodate theory, a plaintiff must show that: (1) the plaintiff "had a bona fide religious belief,

Page 35 – OPINION AND ORDER

the practice of which conflicts with an employment duty"; (2) the plaintiff "informed [their] employer of the belief and conflict"; and (3) "the employer discharged, threatened, or otherwise subjected [the plaintiff] to an adverse employment action because of [the plaintiff's] inability to fulfill the job requirement." *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 606 (9th Cir. 2004). Once a plaintiff has made a *prima facie* case, the burden shifts to the defendant to show either that it *either* "initiated good faith efforts to accommodate reasonably the employee's religious practices *or* that it could not reasonably accommodate the employee without undue hardship." *Bolden-Hardge v. Off. of Cal. State Controller*, 63 F.4th 1215, 1224 (9th Cir. 2023) (emphasis added) (internal citation and quotation marks omitted). "[T]he good-faith-effort and undue-hardship defenses are independent of each other." *Williams*, 2026 WL 1239760, at *3. If the employer establishes undue hardship, the analysis is done and summary judgment should be granted. *See Peterson*, 358 F.3d at 608.

Even assuming that Plaintiff establishes a *prima facie* religious accommodation claim, PeaceHealth contends that there is no genuine dispute that Plaintiff could not fully perform the essential functions of her job 100% remotely and that any accommodation other than administrative leave would have caused undue hardship. Def. Mot. at 19–20.

A.    *Plaintiff could not work fully remotely*

In August 2021, Plaintiff was employed as an Environmental Services Attendant at PeaceHealth's Sacred Heart Medical Center. Le Decl. ¶ 34. Plaintiff described her role as a "housekeeping job" that involved cleaning patient rooms and

other areas in the hospital like office areas, lobbies, bathrooms, break rooms, and operating rooms. Navarrete Dep. 12:22–13:13, 18:19–22, ECF No. 62-7. The essential functions of Plaintiff's job required her to "coordinate with [her] manager[] and nursing staff to turn over patient rooms and clean shared spaces." Le Decl. ¶ 34; *see also* Riggs Decl. ¶ 11, Ex. 10, "Caregiver Job Description," ECF No. 62-8 ("This position is responsible for the cleaning and sanitizing [of] rooms, floors, fixtures and furnishings in assigned work area[s]," and the employee was required to "[m]aintain housekeeping cart, restock paper receptacles, replace sharps containers, and orders supplies essential to the job" and "[i]n clinical areas, [to] communicate with clinical personnel to determine priority of cleaning needs[.]"). Plaintiff does not dispute that she could not fully perform the essential functions of her job remotely. *See* Riggs Decl. ¶ 13, Ex. 12, Answers No. 5 and No. 6 to Second Set of Requests for Admission, ECF No. 62-10.

B.    *Undue Hardship*

To prevail on an undue hardship defense, "an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Groff v. DeJoy*, 600 U.S. 447, 470 (2023). To assess "substantial increased costs," *Groff* directs courts to "take[] into account all relevant factors . . . including the particular accommodations at issue and their practical impact in light of the nature, size[,] and operating cost of [an] employer[]" and to "resolve whether a hardship would be substantial in the context of an employer's business in [a] common-sense manner[.]" *Id.* at 470–71. *Groff* thus

Page 37 – OPINION AND ORDER

directs courts to examine all "relevant factors" and "their practical impact" on the employer's business.

In the COVID-19 vaccination context, the Ninth Circuit held that relevant undue hardship factors under *Groff* include: (1) "health and safety costs[,]" which the court analyzed as health and safety *risks* to the plaintiffs' coworkers and to the public they served; (2) the employer's "operational burdens;" (3) and the employer's "financial burdens." *Petersen*, 150 F.4th at 1218, 1220 (affirming summary judgment for the employer on its undue hardship defense to unvaccinated firefighters' Title VII failure-to-accommodate claims); *see also Williams*, 2026 WL 1239760, at *3 (affirming summary judgment for employer healthcare facility on its undue hardship defense to unvaccinated healthcare employees' Title VII failure-to-accommodate claims for similar hardship reasons).

The EEOC also provides guidance as to relevant factors in the COVID-19 context. "Costs to be considered include not only direct monetary costs but also the burden on the conduct of the employer's business—including, . . . the risk of the spread of COVID-19 to other employees or to the public[.]" *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws*, § L.3 ("EEOC Guidance").[21]  To determine whether a COVID-19 accommodation would create an undue hardship, the EEOC recommends that employers consider:

---

[21] EEOC, WHAT YOU SHOULD KNOW ABOUT COVID-19 AND THE ADA, THE REHABILITATION ACT, AND OTHER EEO LAWS, § L.3 (updated May 15, 2023) https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws (last visited May 19, 2026).

Page 38 – OPINION AND ORDER

- the proportion of employees in the workplace who already are partially or fully vaccinated against COVID-19 and the extent of employee contact with nonemployees[;]

- the burden on the conduct of the employer's business—including . . . the risk of the spread of COVID-19 to other employees or to the public;

- whether the employee requesting a religious accommodation to a COVID-19 vaccination requirement works . . . in a solitary or group work setting, or has close contact with other employees or members of the public (especially medically vulnerable individuals); and

- the number of employees who are seeking a similar accommodation, *i.e.*, the cumulative cost or burden on the employer.

*Id.* *Groff* did not displace pre-existing EEOC guidance. Rather, *Groff* stated that "a good deal of the EEOC's guidance [as to undue hardship] is sensible and will . . . be unaffected by our clarifying decision[.]" *Groff*, 600 U.S. at 471; *see also Petersen*, 150 F.4th at 1220 ("*Groff* tells us that we may look to EEOC guidance to help determine if . . . health and safety costs would have imposed an undue hardship on [an employer].").

Accordingly, to analyze undue hardship, courts in this district consider: (1) the information available at the time the employer made its undue hardship decision; (2) the economic and non-economic costs of the accommodation; and (3) the cumulative or aggregate effects of accommodations requested by multiple, similarly situated employees. *Lavelle-Hayden*, 744 F. Supp. 3d at 1151–52.

1. *The Information Available at the Time*

"[I]t is appropriate to confine the [undue hardship] analysis to the information available to the employer when it made its undue hardship decision." *Lavelle-*

*Hayden*, 744 F. Supp. 3d at 1152. "To judge an employer's undue hardship decision based on knowledge and information developed after the fact would hold that employer to an impossible standard." *Id.*; *see also Williams*, 2026 WL 1239760, at *4 (the analysis requires that the employer "acted reasonably" in relying "on the objective, scientific information available to it").

When PeaceHealth's Team formulated its vaccination and exception policy, the information available at the time included: (1) the OHSU Delta forecast that predicted a surge of cases in Oregon from the Delta variant and a rapid increase in PeaceHealth Delta cases that met or exceeded the forecasts, Koekkoek Decl. ¶¶ 21 (citing Ex. 4–6), 22 (citing Ex. 7–9, ECF No. 59-7, 59-8, 59-9), 49; (2) the scientific and medical evidence that showed that COVID-19 vaccines were safe and effective, protected against severe illness and death, and reduced viral transmission even in breakthrough cases, *id.* ¶¶ 14, 37–47 (citing Ex. 13–21); (3) the recommendations by CDC and other authorities, even given breakthrough data, to implement vaccine mandates for healthcare workers, *id.* ¶¶ 19, 20, 30, 35, 36, 42, 43, 44, 47, 63 (citing Ex. 3, 15–17, 20, 21); (4) the OHA Rule that required vaccination for health care employees and removed the testing option as Delta cases surged, *id.* ¶¶ 36, 63; (5) the PeaceHealth census data that showed a predominantly medically vulnerable and unvaccinated patient population, *id.* ¶¶ 7, 22, 38.

The Team considered vaccination alternatives but determined, based on the unrebutted scientific and medical data available at the time, that "[t]here was no substitute for vaccination." *Id.* ¶ 59. The Team determined that, without vaccination,

Page 40 – OPINION AND ORDER

other methods were insufficient. "PPE (including N95 masks), testing, social distancing, restrictions on visitation, and additional hand hygiene protocols—were already the 'baseline' requirements, [but] do not provide continuous protection 24 hours per day, and are susceptible to human error[,]" *id.* ¶ 55, that PPE must be worn "constantly and appropriately" and is often not, for example, in breakrooms when people are eating and drinking, *id.*, that testing is problematic because "by the time an individual tests positive, they have often been contagious for 48 hours prior to the test[,]" *id.* ¶ 56, and that operationalizing "grand scale" testing would have been "extremely difficult, if not impossible, logistically[,]" *id.*, in part, due to supply chain shortages and lack of capacity, *id.*

PeaceHealth considered accommodation for three categories of employees: (1) employees who provided direct patient care; (2) employees who, like Plaintiff, did not provide direct patient care but who interacted with staff who did; and (3) employees who could work remotely without contact with other staff. Koekkoek Decl. ¶ 53. Based on the available information, PeaceHealth determined that allowing an employee to work unvaccinated onsite would not only put that employee at risk but would also pose unjustifiable health and safety risks to other staff and directly or indirectly to PeaceHealth's vulnerable patient population. Koekkoek Decl. ¶¶ 48, 49, 51–63.

### 2.    *The Cost of Accommodation in the Aggregate*

To determine whether a proposed accommodation would impose substantial increased costs on the employer, courts consider (1) the health and safety risks to the

Page 41 – OPINION AND ORDER

public and to other employees in the workforce; (2) the operational burden created by absenteeism, scheduling disruption, and the inability of the employer to respond to emergencies; and (3) the financial costs of the accommodation. *See Petersen*, 150 F.4th at 1218–21; *see also Williams*, 2026 WL 1239760, at *3 ("[*Groff's*] 'substantial additional costs' . . . need not be exclusively monetary; [t]hey can extend to 'health and safety costs' and 'operational burdens' as well as traditional 'financial burdens'"); *Groff*, 600 U.S. at 475 (Sotomayor, J., concurring) ("Because the 'conduct of [a] business' plainly includes the management and performance of the business's employees, undue hardship on the conduct of a business may include undue hardship on the business's employees. . . . Indeed, for many businesses, labor is more important to the conduct of the business than any other factor.").

Further, "costs need not be realized prior to raising an undue-hardship defense." *Williams*, 2026 WL 1239760, at *3. "A risk of undue hardship' will suffice— provided it is realistic and not merely conceivable or hypothetical." *Id.* (cleaned up). *See, e.g.*, *Bordeaux v. Lions Gate Ent., Inc.*, 703 F. Supp. 3d 1117, 1136 (C.D. Cal. 2023), *aff'd*, No. 23-4340, 2025 WL 655065 (9th Cir. Feb. 28, 2025) ("Numerous courts have found the possibility of an unvaccinated individual getting others sick to be a non-speculative risk that a court may consider when performing an undue hardship analysis.") (collecting cases); *Melino v. Bos. Med. Ctr.*, 127 F.4th 391, 397 (1st Cir. 2025) ("permitting [a hospital employee] to work unvaccinated would pose an undue hardship 'by increasing the risk of COVID-19 transmission amongst staff and patients'"); *Hall v. Sheppard Pratt Health Sys., Inc.*, 155 F.4th 747, 754–55 (4th Cir.

2025) ("Allowing over two hundred religious-exemption claimants to remain unvaccinated would have unacceptably increased the risk of COVID-19 transmissions and outbreaks[,]" but "[i]t is likely that granting even [a] single religious exemption would have constituted an undue hardship for the hospital system."); *Petersen*, 150 F.4th at 1220 (brackets omitted) (explaining that the operational burden from "outbreaks among firefighting teams [from unvaccinated co-workers]" included "potentially severe limits on EMS and firefighting responses in the community.").

When multiple, similarly situated employees request accommodation, it is appropriate for a court to "consider the aggregate or cumulative effects of an accommodation[.]" *Lavelle-Hayden*, 744 F. Supp. 3d at 1152; *see also Petersen*, 150 F.4th at 1220 ("The cost of accommodating nearly twenty-five percent of its firefighters is substantial. . . . And given the circumstances, there can be no doubt that granting that many exemptions would have hamstrung [the Fire and Rescue's] operations."); *Kather v. Asante Health Sys.*, No. 1:22-CV-01842-MC, 2025 WL 1788267, at *7 (D. Or. June 25, 2025) ("In addition to the administrative strain, the sheer number of exception requests compounded the undue hardship inherent in allowing unvaccinated individuals to work in person because the cumulative risk [to the health and safety of patients and the workforce] would have been much greater than the individual impact of any single unvaccinated employee.").

PeaceHealth attests that by December 27, 2021, it had received medical and/or religious exception requests from 968 employees system-wide, of which it granted 810. Le. Decl. ¶ 23. In Oregon, PeaceHealth received 243 medical and/or religious

exception requests, of which it granted 206. *Id.* PeaceHealth attests that it placed all unvaccinated employees who, like Plaintiff, could not perform the essential functions of their jobs 100% remotely on administrative leave. *Id.*

Plaintiff contends that PeaceHealth could have accommodated her with N95 respirator and "regular testing." But even assuming that PeaceHealth could have obtained a sufficient supply of N95 respirators to accommodate hundreds of exempted unvaccinated employees and could have obtained sufficient testing supplies and could have operationalized daily or weekly testing of hundreds of employees, the unrebutted scientific and medical evidence at the time showed that such measures were insufficient, compared to vaccination, to protect employees from severe disease and death and to mitigate viral spread. Based on that evidence, PeaceHealth determined that allowing unvaccinated employees to work onsite, regardless of accommodation, would have placed those employees at risk and would have increased the health and safety risk to other staff and to its vulnerable patient population. As in *Williams*, PeaceHealth determined that unvaccinated employees in the workplace would have created "three distinct risks," including the increased "risk that [e]mployees would become ill and cause staffing issues from their absence;" the increased "risk of infection [to] other staff[,]" and an increased "transmission risk" to the hospital's patient population. *Williams*, 2026 WL 1239760, at *4.

Increasing the risk of viral spread (and the risk of severe illness and death) to PeaceHealth's vulnerable and largely unvaccinated patient population alone would have constituted undue hardship. "Health and safety costs matter . . . [a]nd in the

context of [a healthcare facility's] particular business, they make all the difference." *Id.* An increased risk of viral spread to PeaceHealth's patient population would have prolonged patient stays and further impaired PeaceHealth's ability to provide care during the pandemic. *See* Kroll Decl. ¶ 30 ("Hospital-acquired COVID-19 could prolong a patient's stay in one of [PeaceHealth's] facilities by days or weeks, further straining limited hospital resources.").

An increased risk of illness or severe disease or death among employees would have increased the operational burdens from absenteeism, labor shortages, and scheduling disruptions. These were not theoretical concerns. PeaceHealth was already experiencing severe operational and administrative disruption from labor shortages due to COVID-19. Ms. Le attests that such disruption "placed an incredible strain on an already exhausted staff to cover shifts and hire and train contract healthcare workers." Le Decl. ¶ 24. And Dr. Koekkoek attests that such disruption "threatened PeaceHealth's ability to continue providing essential, life-saving treatment for its patients." Koekkoek Decl. ¶ 49. Increased disruptions would have directly translated into a substantially increased financial burden. And the additional cost to operationalize, for hundreds of employees, fitted N95 respirators and daily or weekly testing—even assuming that PeaceHealth could have obtained sufficient supplies/capacity—and to monitor and enforce compliance would have been untenable. "Taken together, [such] 'realistic' concerns threatened a 'substantial' burden on [PeaceHealth's] business of providing quality healthcare." *Williams*, 2026 WL 1239760, at *4.

For these reasons, the Court concludes that, on this record, there is no issue of material fact that accommodating Plaintiff—and hundreds of other unvaccinated coworkers—with N95 respirators and "regular testing" in lieu of vaccination would have imposed undue hardship under Title VII and Oregon law.

### C.    *Plaintiff's Other Arguments*

#### 1.    *Direct Threat*

Plaintiff argues that a triable issue exists as to whether accommodating Plaintiff would have posed a direct threat to others in the workplace.  Pl. Resp. at 26, 28, 31, 34.  Direct threat is an affirmative defense to an ADA, not a Title VII, accommodation claim.  *See* 42 U.S.C. § 12111(3) (defining "direct threat" under the ADA); 29 CFR § 1630.2(r) (ADA direct threat criteria); *Echazabal v. Chevron USA, Inc.*, 336 F.3d 1023, 1028 (9th Cir. 2003) (explaining ADA direct threat criteria).  Because Plaintiff brings only a Title VII accommodation claim, Plaintiff's argument as to direct threat does not apply here.  By citing ADA cases such as *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105 (9th Cir. 2000), *vacated sub nom.*, *US Airways, Inc. v. Barnett*, 535 U.S. 391 (2002), Plaintiff also appears to argue that a triable issue exists as to whether accommodating Plaintiff would have imposed significant difficulty or expense.  Pl. Resp. at 26–28.  "Significant difficulty or expense" is the undue hardship standard under the ADA, not Title VII.  *See* 42 U.S.C. § 12111 (10) (ADA); 42 U.S.C. § 2000e(j) (Title VII).  Plaintiff's reliance on the ADA cases is misplaced.  The Supreme Court recently clarified Title VII's undue hardship standard, *see Groff*, 600 U.S. at 470–71 ("substantial increased costs in relation to the conduct of [an

employer's] particular business") and the Ninth Circuit has applied that standard to COVID-19 Title VII accommodation cases like this one.  *See, e.g.*, *Williams*, 2026 WL 1239760, at *4.  To the extent that Plaintiff's argument relies on ADA case law, it is not on point.

### 2.    *Good Faith Efforts*

Plaintiff next argues that a triable issue exists as to whether PeaceHealth engaged in good faith efforts to reasonably accommodate Plaintiff's religious beliefs. Pl. Resp. at 28 (arguing that "PeaceHealth's so-called interactive process was a sham").  As the Ninth Circuit recently explained, "[a]n employer need not make 'an effort [to accommodate] if it can show that any accommodation would impose undue hardship.'"  *Williams*, 2026 WL 1239760, at *3 (brackets in original) (quoting *Heller v. EBB Auto Co.*, 8 F.3d 1433, 1440 (9th Cir. 1993)).  "[T]he good-faith-effort and undue-hardship defenses are independent of each other."  *Id.*; *see also Bolden-Hardge*, 63 F.4th at 1224 (to defend against a Title VII failure to accommodate claim, an employer can show *either* that it initiated good faith efforts to accommodate the employee's religious practices *or* that it could not reasonably accommodate the employee without undue hardship).

Here, PeaceHealth considered an array of reasonable COVID-19 mitigation measures including Plaintiff's proposed accommodation of N95 respirator and testing but concluded that "[v]accination was at the top of the hierarchy of controls for COVID-19" and that "[t]here was no substitute for [it]."  Koekkoek Decl. 59, 37–47, 54; Cohen Rebuttal ¶¶ 8–11, 28.  PeaceHealth determined that, unlike vaccination,

masking and testing were retroactive measures subject to human error, compliance challenges, and other shortcomings and that they also were not feasible, given critical supply shortages. *See* Koekkoek Decl. ¶¶ 32, 54–56; Cohen Report ¶¶ 35–37; Cohen Rebuttal ¶¶ 28–32. For these reasons, PeaceHealth determined that it could not reasonably accommodate unvaccinated employees in the workplace without undue hardship. PeaceHealth's undue hardship showing is "a complete defense to a Title VII claim even if there was 'no attempt at accommodation' at all." *Williams*, 2026 WL 1239760, at *5 (quoting *EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 615 n.7 (9th Cir. 1988)). For that reason, PeaceHealth was not required to initiate good faith efforts to reasonably accommodate Plaintiff's religious beliefs.

### 3.    *Continuing Duty*

Plaintiff contends that PeaceHealth had a "continuing obligation" to participate in a good faith interactive process to accommodate Plaintiff's religious beliefs months and years after the August 2021 accommodation decision. Pl. Resp. at 40. Plaintiff maintains that by 2022, during the Omicron wave, her proposed accommodation would not have imposed an undue burden on PeaceHealth. *Id.* As explained above, because PeaceHealth determined that it could not accommodate Plaintiff without undue hardship, it was not required to engage in a good faith interactive process to accommodate Plaintiff to begin with. Here, no interactive-process duty ever existed, so there was nothing to continue.

Page 48 – OPINION AND ORDER

4.    *Discriminatory Motive*

Plaintiff also argues that a triable issue exists as to whether PeaceHealth acted with "anti-religious bias" because (1) it failed to evaluate "the unique risk [Plaintiff] presented[;]" and (2) it abruptly removed its masking and testing option in August 2021 after it "learned [that] the vast majority of accommodation requests were *religious*, not medical[]" and "with no intervening change in science, guidance, or conditions[.]" Pl. Resp. at 28–29 (emphasis in original).

First, discriminatory intent is not an element of a Title VII failure to accommodate claim and is irrelevant here. *Lavelle-Hayden*, 744 F. Supp. 3d at 1149–50. Second, the Ninth Circuit "ha[s] squarely rejected the view that an employer cannot bring up 'undue hardship' unless it first proves that it made good faith efforts to accommodate the employee's religious practice." *Williams*, 2026 WL 1239760, at *5 (cleaned up). As explained above, where "no accommodation is possible without undue hardship, then consideration of a particular accommodation is an exercise in futility." *Id.* (collecting cases). Here, PeaceHealth determined that any onsite accommodation of unvaccinated employees would impose undue hardship. Once PeaceHealth determined that Plaintiff could not perform the essential functions of her job 100% remotely, PeaceHealth was not required to further consider Plaintiff's "unique risk."

Third, the record does not support that PeaceHealth removed its masking and testing option in August 2021 "with no intervening change in science, guidance, or conditions." Pl. Resp. at 29. PeaceHealth initially expected to accommodate a small

Page 49 – OPINION AND ORDER

number of employees and was "surprised by the sheer volume of exception requests"—both religious *and* medical. Koekkoek Decl. ¶¶ 34, 59 ("By August 16, 2021, it became clear there would not be just a handful of unvaccinated caregivers . . . but hundreds of them, thereby increasing supply needs, costs, administrative and logistical challenges, and exposure risks[.]"). Having to accommodate hundreds of employees is sufficient, on its own, to constitute undue hardship, regardless of whether those exceptions are religious or medical or both. *See, e.g.*, *Petersen*, 150 F.4th at 1220 (explaining that accommodating more than 46 religious exemptions from COVID-19 vaccination "would have hamstrung [defendant's] operations"). But, in addition, at that time, conditions rapidly deteriorated. The Oregon Delta forecast became increasingly dire. Koekkoek Decl. ¶ 21. The number of Delta cases and the incidence of severe illness and death due to Delta in PeaceHealth facilities surged dramatically. *Id.* ¶¶ 11–13, 22, 49. Authorities, including the CDC, began to call for vaccination mandates in healthcare facilities. *Id.* ¶ 30. PeaceHealth wards overflowed with COVID-19 patients, non-emergency procedures were cancelled, the national guard was called to assist, and PeaceHealth had to create "cooling bays" to store dead bodies. *Id.* ¶¶ 11–13, 24, 54. In response, PeaceHealth implemented a COVID-19 policy based on the available science and, most notably, on CDC recommendations—a policy that applied uniformly to all of its employees.

On this record, no reasonable jury could conclude that, in August 2021, PeaceHealth could have accommodated Plaintiff and hundreds of other unvaccinated

Page 50 – OPINION AND ORDER

employees with N95 respirators and "regular testing" without undue hardship on the

conduct of its healthcare business.

## CONCLUSION

For the reasons explained above, Defendant's Motion for Summary Judgment,

ECF No. 58, is GRANTED.  Judgment shall be entered accordingly.

It is so ORDERED and DATED this 31st day of May 2026.


s/ Ann Aiken
ANN AIKEN
United States District Judge

Page 51 – OPINION AND ORDER